In The
*Court of Appeals*
*Ninth District of Texas at Beaumont*
NO. 09-22-00260-CV
IN THE INTEREST OF I.N.B.

On Appeal from the County Court at Law
Orange County, Texas
Trial Cause No. C210257-D

## OPINION

Following a bench trial, Z.P. ("Father") appeals the trial court's order terminating his parental rights to his minor child, I.N.B, based on Texas Family Code subsection 161.001(b)(1)(Q) and a finding that termination was in I.N.B.'s best interest.[1, 2] *See* Tex. Fam. Code Ann. § 161.001(b)(1)(Q), (2). In two issues, Father

---

[1]In parental rights termination cases, to protect the identity of the minors, we refer to the children by a pseudonym or initials and family members by their relationships to the children. *See* Tex. Fam. Code Ann. § 109.002(d); Tex. R. App. P. 9.8(b)(2).

[2]The Department also sought to terminate C.B.'s ("Mother") rights, and the trial court found that evidence supported predicate grounds D, E, and P; however, the trial court found that it was not in I.N.B.'s best interest to terminate her rights

challenges the legal and factual sufficiency of the evidence supporting predicate ground Q and the trial court's best interest finding. Also regarding the best interest finding, Father contends that the Department's failure to comply with the trial court's order to produce records violated his due process rights and hampered his efforts to comply with the requirements to avoid termination. We affirm the trial court's judgment terminating Father's parental rights to I.N.B.

## BACKGROUND

In April 2021, the Department of Family and Protective Services ("the Department") filed its Original Petition for Protection of a Child, for Conservatorship, and for Termination in Suit Affecting the Parent-Child Relationship naming I.N.B. as the subject of the suit and seeking to terminate Mother and Father's parental rights. The Petition was supported by Department Investigator Tracey Marks's Affidavit of Removal. The Department outlined Mother's history with the Department involving I.N.B.'s older siblings. The Affidavit also described Mother and I.N.B.'s prior history with the Department, specifically, that they both tested positive for amphetamines at I.N.B.'s birth, and Mother admitted to methamphetamine use throughout her pregnancy with I.N.B. The Affidavit explained that I.N.B. suffered severe withdrawals after birth that required treatment

---

and named the Department as I.N.B.'s conservator. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E), (P), (2). Mother is not a party to this appeal.

2

with phenobarbital, and I.N.B. was removed but subsequently returned to Mother in late 2018 after she "worked services."

In the "Facts Necessitating Removal" portion of the Affidavit, Marks averred that in March 2021, Child Protective Services (CPS) received a neglectful supervision report of I.N.B. by Mother and that Mother may be using methamphetamines. Despite Mother's initial denial, when the investigator contacted her, Mother's urinalysis came back "negative dilute" and a subsequent hair follicle test was positive for methamphetamines. I.N.B. was removed in April 2021.

The record established that Father was not incarcerated during the 2018 case but did not participate in services or DNA testing. At the time of the 2021 removal, Father was incarcerated for multiple felony convictions that occurred in May 2019, including burglary and possession of a controlled substance. The felony possession of a controlled substance conviction resulted in a six-year sentence. Although paternity was not established by DNA testing until February 2022, the record established that Father knew in 2017 when Mother was pregnant that I.N.B. was his child.

## DEPARTMENT'S RECORDS

In July 2021, the trial court signed an Order Setting Deadlines. This Order required the Department to produce redacted records and distribute them to all parties/counsel by August 27, 2021, and stated that "the Department shall produce

UPDATED, supplemental, REDACTED RECORDS and distribute same to all counsel of record on a monthly basis due on or before the 20th day of each month hereafter." In March 2022, Father filed a pretrial Motion to Dismiss with Prejudice and Motion for Sanctions complaining about the Department's failure to timely comply with the trial court's order to produce redacted records. In April, Father filed an Amended Motion to Dismiss with Prejudice and for Sanctions complaining of the Department's failure to produce records in compliance with the trial court's order.

On April 25, 2022, trial court conducted a pretrial evidentiary hearing[3] addressing the Department's records, alleged failure to timely produce them, and Father's complaints that the records produced were missing certain items, including text messages, phone call notes, home studies, and psychological evaluations. During the pretrial evidentiary hearing, the trial court heard testimony from a Department supervisor and caseworker regarding the production of records. The supervisor described the various dates they produced updated documents, and given some of the complaints, the Department requested the entire file be redacted again. The parties clarified that the entire file was provided again (re-redacted) to the D.A.'s file at the end of March 2022, then the Department sent the last of the records to the D.A.'s office on April 7, 2022. However, the parents represented the last date they received redacted records was December 13, 2021. The supervisor explained that

---

[3]Following the hearing, trial testimony commenced later that afternoon.

4

they provided a disc of these redacted records to the D.A.'s office and believed the D.A.'s office would upload them to a portal accessible to all parties, but the D.A.'s office did not do so as it thought the supervisor was providing discs to all parties. She further explained the failure to produce the updated set of redacted records in their entirety was the result of a miscommunication discovered the morning of the pretrial evidentiary hearing.

During the pretrial evidentiary hearing, the trial court explained it set aside the Department's monthly deadline to supplement the records by the 20th "as a general practice" at an earlier hearing, because the local office could not control how quickly the records were redacted in Austin; however, she did not absolve the Department of producing the records. When the pretrial evidentiary hearing concluded, the trial court gave the parents the option of 1) postponing the trial to ensure any issues with the Department's records were sorted out, and the parents had time to review them all, or 2) go forward with trial, and the Department would only be able to proceed with the records timely provided by the Texas Rules of Civil Procedure or included in the redacted records produced on December 13, 2021, unless they could get them in another way, at which point she would consider objections and rule based on what she heard. Mother chose to proceed with trial, but they could not reach Father, who had chosen to participate via Zoom rather than in person.

After all parties rested but prior to closing arguments, Father's counsel attempted to make a proffer or bill of exception of a thumb drive containing all records received from the Department to show what documents were missing. The trial court explained that admitting the records in their entirety did not show what was missing, instead, counsel should offer the records she did not get before trial. The trial court allowed the proffer but would not admit them.

TRIAL EVIDENCE[4]

Removal Caseworker Lana Murphy's Testimony

Lana Murphy testified that she was the removal caseworker for I.N.B. Murphy explained that she first met with Mother on April 20, 2021, and she completed the placement paperwork with fictive kin, T.D., who was Mother's ex-husband and the biological father of I.N.B.'s siblings. When Murphy met with Mother, the removal had already occurred, and Mother told the initial investigator that she wanted I.N.B. placed with T.D., so that investigator did what she could to place the child there.

Murphy then visited Father in jail on April 22, 2021, where she presented him with a Child Caregiver Resource Form to list potential placements for I.N.B. Murphy explained that Mother had already identified T.D., so she signed a blank form, but Father refused to sign anything and said he did not want to be involved.

---

[4]In this section, we limit our discussion to the evidence relevant to Father's complaints on appeal.

Murphy testified that the investigating caseworker would have conducted a preliminary home study to insure it was appropriate, which includes checking CPS, criminal history, and collateral contacts. Murphy explained that once the child is placed, a contractor would conduct a formal home study, which would then be presented to CPS for approval. If the child is placed there, they should have requested the formal home study before the adversary hearing. Murphy also described the process of requesting home studies.

Department Investigator Tracey Marks's Testimony

Marks testified that she is a CPS investigator and was assigned to I.N.B.'s case beginning in March 2021. Marks testified they received an intake of neglectful supervision by Mother, specifically that Mother was using methamphetamines. Mother told Marks she had not used any drugs since I.N.B. was returned to her custody following the 2018 case, but Mother's urinalysis came back "negative dilute," so they had her do a hair follicle test, which was positive. Marks explained that when they requested Mother do the hair follicle test, she informed them it would be positive for methamphetamines. Marks testified to the family's CPS history, which included prior intakes of drug use by Mother in 2010, 2016, and 2018. The 2016 and 2018 intakes involved her children testing positive at birth. Marks testified that in 2018, Mother successfully worked her services, and I.N.B. was returned to her, but two years later, she tested positive for drugs again.

Marks said that when she informed Mother of the test results, Mother responded she had placement for I.N.B. and wanted him placed with T.D. Marks testified she then went to T.D.'s house, and he was cooperative. Marks indicated that T.D. was forthcoming with his information but hesitant to give his fiancée's, because he was unsure if she wanted to be a part of the case. T.D. also advised that his mother, K.D., would be the backup medical consenter. Marks testified she walked through the home, everything seemed appropriate, and the removal worker took over from there. I.N.B. was placed with T.D. on April 20, 2021, a little over a month after the intake. Marks said she did not order the home study but did not know if the removal worker ordered one. She described the process of ordering a home study. Marks testified that the required information to begin T.D.'s home study would be his name, date of birth and social, and she had that information on T.D. and his girlfriend.

According to Marks, in March 2021, Mother told her that I.N.B. had never met Father, and Father had never laid eyes on I.N.B. When Marks asked about Father's family for placements, Mother told her she did not know where Father was. Marks said she never met with Father, but a note indicated Father wanted a home study done of his mother that Marks entered; however, she testified that Murphy may have been involved at that point and could have sent that information to her, which she entered.

8

Paternal Grandmother's Testimony

Father's mother, Grandmother, testified at trial. She testified she visited I.N.B. in the hospital when he was born but only stayed in the NICU five minutes, because it was upsetting to see him in pain and going through withdrawals. Grandmother testified that when I.N.B. was small, she visited him through CPS and Mother, and after he was returned to Mother, she still allowed Grandmother to see I.N.B.

Grandmother testified she knew of Father's drug problem, which he has had since the age of seventeen and is now thirty-two. Grandmother said Father has been in and out of prison most of his adult life. His criminal history includes drug charges, burglary, and evading arrest. During Grandmother's testimony, the Department entered copies of Father's criminal convictions, including three felony convictions from January 2022, specifically felony theft, evading arrest, and felony possession of a controlled substance. Father received a six-year sentence for the felony possession of a controlled substance and nineteen-month sentences for the other two charges. Grandmother confirmed that Father's parole was recently denied. Grandmother testified there are other counties Father has convictions in, but there have been so many she cannot keep track of them all.

Grandmother testified that I.N.B. has been exposed to methamphetamines twice and needs a stable home and a fresh start, and she wants what is best for him. Grandmother did not feel he should go back to Mother, because this is the second

9

time she has exposed him to drugs, and she fears it will happen again, and he will be moved, which is hard on him. Grandmother was contacted about being a placement for I.N.B. but she has custody of another grandchild, so she could not take I.N.B.

Grandmother did not feel that Father would be an appropriate placement for I.N.B., given his repeated behaviors. While in jail, Father says he will change, but when released, he returns to the same crowd doing the same thing in a week. Grandmother testified that Father was not incarcerated when he learned Mother was pregnant with I.N.B. According to Grandmother, Mother told her Father wanted her to have an abortion and hit her in the stomach when she was pregnant. Grandmother also testified that Father has not wanted anything to do with I.N.B. since he was born. Grandmother explained that Father had opportunities to see I.N.B. but denied them; I.N.B. does not know Father, and he does not know I.N.B. Grandmother testified that Father did not care about I.N.B., and if he did, he would have been involved "from day one." Grandmother testified that Father had only seen I.N.B. three or four times since his birth and never provided any financial support. Grandmother testified that when Father was not in jail, he had never done the right thing for I.N.B. She said that Father has only wanted contact with I.N.B. since he has been incarcerated this time. Grandmother testified the possibility of Father getting out of jail and separating himself from his past was slim.

Grandmother said that T.D. allowed her to continue seeing I.N.B. while he was placed there. Grandmother testified that after I.N.B. was removed from T.D., Department Supervisor Lacie Salinas and Caseworker Kristina Nieto called her to ask if there were any other family members that they could place him with, but Grandmother did not have any names to give them. Grandmother felt that T.D.'s parents, K.D. and D.D., loved I.N.B., accepted him as a grandchild, and in I.N.B.'s mind, they were his grandparents. Grandmother testified that Father told her in a letter he was open to K.D. and D.D. taking I.N.B. but did not know if he shared that with the caseworker.

Grandmother explained that she has concerns after speaking with K.D., because K.D. told her she had a history of hydrocodone use and marijuana use, supposedly had not been using them in a while, but her drug test was positive for hydrocodone. Grandmother believed K.D. and D.D. are so connected to Mother that it would not give I.N.B. the fresh start he needs. Grandmother believed that it was in I.N.B.'s best interest to have a fresh start without continuing access to Mother and Father because of the past.

Grandmother testified that terminating both parents' rights was in I.N.B.'s best interest. Grandmother believed Father's past behavior is a good predictor of his future behavior. Grandmother testified she would like the current foster family to have the opportunity to adopt I.N.B.

Grandmother testified a second day and offered insight regarding her son's failure to attend the trial by Zoom. Specifically, Grandmother testified that Father contacted her the previous evening and confirmed he did not get out of bed the day before, because he did not want to talk to his attorney. Grandmother testified that Father's plan was to relinquish his rights, and he spoke with Mother about it. Grandmother agreed that some of Father's testimony contradicted the notion that he wanted out from the beginning, but noted her son often contradicts himself. Grandmother said Father told her that he would like for I.N.B. to remain in his current placement since he is doing well, or he would agree to T.D.'s family, because Grandmother could still see him.

Mother's Testimony

Mother admitted that I.N.B. was born addicted to methamphetamines because she used while pregnant, and after I.N.B. was returned to her, in 2021, I.N.B. tested positive for methamphetamines again, because she exposed him to it. Mother testified that she was in a relationship with Father for about three years, and she used drugs with Father during that time. Mother testified that Father was angry that she would not have an abortion but denied he hit or kicked her in the stomach. Mother said that Father had only seen I.N.B. three to five times, has never been a part of his life, and does not have a relationship with him. Mother said Father never paid child support.

Mother explained that T.Y.D. was Mother's former sister-in-law, and Mother said T.Y.D. could not be a placement for I.N.B. when asked. Mother said she was told that T.D.'s girlfriend was not a good person and used drugs. Mother testified that she expressed concerns about T.D.'s household in August 2021 because T.D.'s girlfriend was drinking alcoholic beverages, and T.D.'s girlfriend did not want to give her information to CPS, because her family has CPS history. Mother testified that she lived with K.D. during this case for a period and was told that I.N.B. could not be placed there while she lived there.

Father's Testimony

Father testified he believed I.N.B. was his child when Mother told him she was pregnant since they had been together a couple of years, but he did not go to the hospital to see I.N.B. when he was born. Father said he did not provide Mother financial or any other support for I.N.B. despite acknowledging a duty to do so. Father testified that he had only seen I.N.B. a couple of times.

Father testified that he was incarcerated on a six-year sentence he received on January 18, 2022. Father testified that the charges were for felony theft, felony evading, and felony possession of a controlled substance, and he committed those crimes after I.N.B. was born. Father said he received credit for time served, his maximum sentence release date is October 2026, and he was recently denied parole

13

based on his criminal history. Father subsequently denied he would be in prison until 2026 and testified he should be released next year even though he was denied parole.

When asked what he wanted for I.N.B., Father said he wanted I.N.B. placed with Mother. Father testified that if placement with Mother is not possible, he wanted I.N.B. placed with K.D. and D.D., so he can be around his siblings. Mother told him she was doing all her services, and Father believed Mother could provide a safe and stable environment for I.N.B. Father testified that if the evidence showed otherwise, he believed D.D. and K.D., T.D., or T.Y.D. could provide a safe and stable environment. Father denied telling Grandmother that he wanted to relinquish his rights and claimed Grandmother lied. Father testified he did not want to relinquish his rights and "can't give up" on I.N.B. Father testified that he wanted Mother to have an abortion while pregnant with I.N.B. but denied hitting her in the stomach.

When asked what he has done to provide a safe, stable home for I.N.B., Father said he picked out K.D. to care for I.N.B. until he is released from prison. When asked if he knew that K.D. had conversations with CPS that she could not pass a home study in the past because she smokes marijuana, Father responded that he did not believe it. Father said if true, it would concern him, but asserted it was untrue.

Father testified he agreed to leave I.N.B. with T.D., and prior to removing him, the caseworkers did not tell Father about any problems. Father testified when

14

he learned I.N.B. had been moved into foster care, he suggested T.Y.D., K.D., or D.D. as caregivers. When Father asked why I.N.B. was moved, he was told there was a failed home study. Father said that in September 2021, he provided other potential placements for I.N.B. which included T.D. and D.D., yet CPS moved I.N.B. into foster care over family. Father testified that he understood that while at T.D.'s home, I.N.B. exhibited concerning behaviors, including cussing, biting, kicking, hitting, and acting out sexually, and Father did not have personal knowledge of anything T.D. did to help I.N.B. with these behaviors. When specifically asked about another caregiver on his Caregiver Resource Form who had struggled with addiction, Father said he would be a good placement if that person was doing well now.

Father testified he was told that I.N.B. was defiant and acting out sexually, which concerns him, but Mother's inconsistent employment history and housing did not concern him. Additionally, despite Mother exposing I.N.B. to drugs again, Father believed it would be good to return him to Mother.

Father testified I.N.B. experienced trauma by being away from his family, relatives, and siblings. Father testified I.N.B.'s worsening behavior in foster homes was because he was kept from Mother and siblings, and he probably felt abandoned. Father agreed it was traumatic for I.N.B. to be exposed to methamphetamines, as was Father's lack of support, and those things were not in I.N.B.'s best interest.

15

Father testified he demonstrated a healthy parent-child relationship with I.N.B. by writing him a couple of letters with pictures once before Christmas and once after, but it had been over three months since I.N.B. heard from him. In total, Father testified he wrote three letters, received two pictures, and he talked to I.N.B. on the phone. Father said he previously worked as a pile driver and had the ability to make $70,000 to $80,000 per year and would be willing to pay child support. Father felt he could provide for I.N.B.'s emotional and physical needs in the future by being a productive citizen and being there for him.

Father denied that he refused to participate during the beginning of trial and claimed Grandmother lied in her testimony. However, following Father's testimony and assertion that Grandmother lied, a jailhouse conversation recorded during trial was played for the jury in which Father admitted to Grandmother he did not want to participate, refused to come, and told her he wanted to relinquish his rights at one point.

Department Supervisor Lacie Salinas's Testimony

Salinas testified that she was the supervisor assigned to this case. Salinas described some of the concerns the Department had with T.D.'s girlfriend, which included leaving an alcoholic beverage in I.N.B.'s reach, which they observed in May and prepared a safety plan to address. Salinas also said the Department failed to document certain text messages involving these concerns and the safety plan and

16

acknowledged it was something they should have done; however, she testified this did not change her position about the case. Salinas explained that they did not immediately remove the child from T.D., because they really wanted the placement to work. Salinas discussed other potential fictive kin placements they considered for I.N.B.

One of the placements they considered was with K.D. and D.D., and Salinas explained why that placement would not work, which included K.D.'s health problems, mental health issues, pill use, and marijuana use. Salinas explained that the first home study the contractor prepared on T.D. contained mistakes so they wanted to obtain a new one. Salinas also discussed the difficulties the Department had in trying to obtain a new home study on T.D. and specifically noted his girlfriend's lack of cooperation. Salinas explained that between August 10 and 19, 2021, Caseworker Kristina Nieto met with Mother to request names of family members for potential placement, and Salinas called Grandmother to get names since they did not want to place I.N.B. in a foster home, but none of them worked out. In August when I.N.B. was removed from T.D. and the Department was looking for other placements, K.D. and D.D. were not mentioned as possible placements for the Department to consider. Salinas testified that K.D. was invited to the family group conference but did not attend.

Salinas testified the Department violated policy by failing to: 1) timely initiate a home study; 2) directly notify Father of the move; and 3) enter text messages.

Caseworker Kristina Nieto's Testimony

Nieto testified that she was the assigned caseworker for I.N.B. Nieto testified she believed Father knowingly engaged in criminal conduct that resulted in his conviction of an offense and is confined or imprisoned with the inability to care for the child for not less than two years from the date of the filing of the petition. Nieto testified she believed it was in I.N.B.'s best interest to terminate Father's rights. With respect to best interest, Nieto testified that Father did not have a relationship with I.N.B., and he has not been able to show he can provide for him or meet his emotional needs.

Nieto was only aware of two letters or pictures Father sent to I.N.B. while the case was pending, but Father facetimed with I.N.B. during two of Mother's visits. Nieto testified that Father had not arranged for any safe, stable person to take care of I.N.B. during his incarceration. Nieto explained she first talked to Father about Grandmother being a placement in May 2021 and then in October 2021, discussed the possibility of K.D. and D.D. being a placement. Father only offered Grandmother as an option, and Nieto was the one who inquired if K.D. and D.D. would be an option. They contacted Grandmother, and she could not take care of I.N.B. Nieto testified that she talked to Father multiple times about placements, but those were

18

the only suggestions. Nieto explained that she identified K.D. and D.D. as potential placements in April 2022, when the court ordered placement was done.

She also described the problems the Department had getting T.D.'s girlfriend to cooperate with the home study information requests. According to Nieto, they agreed to redo the study so it would be accurate and fair to T.D. and his girlfriend, but when the home study contractor reached out to them, they refused. The contractor informed the Department that when they returned to redo the study, T.D. and his girlfriend were uncooperative. Then, on August 10 at 8 p.m., T.D. texted Nieto and told her his girlfriend would do the home study, but Nieto said the contractor would not come back out. Nieto explained they also did not receive the signed safety plan they previously requested from T.D. until August 13, 2021. Nieto said they removed I.N.B. from T.D.'s home on August 19, 2021.

Nieto testified that Father never saw I.N.B. during 2018 even though he was not incarcerated the whole time; they were constantly looking for Father. Nieto explained that Father changed his mind several times about relinquishing his rights.

Nieto testified that I.N.B. had problems, which have become worse over the years. Nieto confirmed that I.N.B. exhibited troubling behaviors since May 2021 while in T.D.'s home. Nieto did not believe T.D. was equipped to deal with the problems or even know what was going on, and he tended to minimize the behaviors. Nieto also testified that she did not believe T.D., K.D., or D.D. would be a good

19

home for I.N.B., because they were involved previously and failed to step in for I.N.B. before CPS became involved. I.N.B. is in occupational therapy, play therapy, and skills therapy, and the current foster family could get him the therapies he needs.

Nieto also acknowledged pages of text messages from T.D. and Mother that had not been entered into the Department's records, and she did not have a good explanation other than they were overwhelmed. She received a "talking to" and will do her best to ensure it does not happen again.

<u>Foster Mother's Testimony</u>

E.D. is I.N.B.'s current foster mother. E.D. testified that she and her husband want to adopt I.N.B. E.D. testified that I.N.B. has been diagnosed with A.D.H.D., disruptive mood dysregulation disorder, oppositional defiance disorder, major depressive disorder, and PTSD, which require active treatment. E.D. outlined multiple types of therapy I.N.B. currently receives. E.D. testified that when I.N.B. acted out sexually and she asked him where he learned it, he told her from a phone belonging to either T.D. or I.N.B.'s older brother living in T.D.'s home. E.D. explained that I.N.B.'s behavior problems require a high level of care, and he has no chance of a successful life if he does not have parents to consistently implement specialized parenting techniques and therapies. E.D. believes that she and her husband can give I.N.B. a safe, stable and loving environment.

E.D. described the concerns she had about K.D. and D.D. as placements and testified that K.D. told her once that she was just too old to take him. E.D. testified that when I.N.B. first came into their care, Mother told her she did not want I.N.B. going to K.D. and that is why no home study was done.

Fictive Family's Testimony (T.D., D.D. and K.D.)

Several members of I.N.B.'s fictive family testified, including fictive grandparents K.D. and D.D. as well as T.D. D.D. denied that I.N.B. had behavioral problems but later agreed he had some behavioral issues that warranted discipline. Despite certain behaviors I.N.B. exhibited warranting big family discussions, D.D. testified they did not seek out additional counseling. D.D. believed I.N.B. progressively worsened in CPS custody. D.D. testified that he and his wife could meet I.N.B.'s needs, including visits to Texas Children's Hospital for I.N.B.'s therapy. D.D. agreed I.N.B. needed intervention and was getting that help in the current placement.

T.D. said he was willing to co-parent with Mother and Father. T.D. testified that he knew Father when he was not under the influence, and he was a hard worker. He believed if Father was not using drugs, he could get a job and pay child support, start working steps, and be able to see I.N.B. T.D. confirmed that I.N.B. knows him as Daddy. T.D. testified that I.N.B. is his son, he took him in as such, has had him since birth, and he does not want him taken away. T.D. testified that Father has never

stepped up for I.N.B., supported him, or filled any type of father role. T.D. also testified that he provided the requested home study information to Nieto in text messages, which were admitted as evidence. However, he acknowledged it was partially true that when one of the ladies called about the home study, his girlfriend may have cursed the second time, because they were both frustrated since they already participated in one. He also testified that they did not return the signed safety plan until August 13, although the Department requested it in July. The text messages with Nieto and introduced by Father confirm this.

K.D. testified that she is the biological grandmother of I.N.B.'s siblings and T.D.'s mother. K.D. said she is not currently smoking marijuana or on any medications that would impair her ability to care for a child. K.D. testified they have sufficient income to meet I.N.B.'s needs if he is placed with them and would be willing to accept placement but said they recently filed for bankruptcy. K.D. further testified that she could co-parent with Father if he "does right" but does not think it is in I.N.B.'s best interest that Father remain in I.N.B.'s life, because he is incarcerated and I.N.B. is too young to understand. Father has not been any part of this child's life. K.D. said she communicated with Father, and he told her that he wanted I.N.B. to be with Mother, but if the judge will not allow that, he would like for K.D. and D.D. or T.D. to have I.N.B.

<u>Other Evidence</u>

Additional evidence admitted at trial included, among other things: copies of Father's criminal convictions; July 2021 and September 2021 status hearing transcripts; January 2022 permanency hearing transcript; Caregiver Resource Forms naming two of Mother's relatives filed January 2022; recorded jailhouse phone conversations between Father and Grandmother; Father's service plan; Father's letters and drawings to I.N.B.; Nieto's correspondence with Father regarding potential placement with fictive kin and relinquishment; emails from Nieto to Father's attorney regarding relinquishment paperwork Father requested; email from Salinas to ad litem regarding potentially moving the child for T.D.'s lack of cooperation with the home study; Kinship Caregiver Home Assessment for fictive kin K.D. and D.D. completed May 2022, Foster Mother's monthly summary updates; text messages between Nieto and D.D.; Kinship Disposition and Summary form dated May 16, 2022, ruling out fictive kin K.D. and D.D. based on K.D.'s positive hydrocodone test and no prescription; drug test results for fictive kin K.D. and D.D.; Kinship Caregiver Home Assessment for fictive kin T.D.; text messages between Nieto and T.D.; text messages between Nieto and Mother; and I.N.B.'s December 2021 psychological evaluation.

Termination

The trial court found by clear and convincing evidence the Department proved predicate termination ground Q as to Father and that termination of Father's parental rights was in I.N.B.'s best interest.

STANDARD OF REVIEW

The standard of proof required in cases seeking termination of parental rights is clear and convincing evidence. *See id.* § 161.001(b); *In re E.N.C.*, 384 S.W.3d 796, 802 (Tex. 2012) (citing *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002)) (other citations omitted). Clear and convincing evidence is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007.

When conducting a legal sufficiency review of the termination of parental rights,

> a court should look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that the finding was true. To give appropriate deference to the factfinder's conclusions and the role of a court conducting a legal sufficiency review, looking at the evidence in the light most favorable to the judgment means that a reviewing court must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so. A corollary to this requirement is that a court should disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible.

*In re J.F.C.*, 96 S.W.3d at 266; *see also In re E.N.C.*, 384 S.W.3d at 802.

24

In a factual sufficiency review, we "give due consideration to evidence that the factfinder could reasonably have found to be clear and convincing[]" and must determine "'whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the State's allegations.'" *In re J.F.C.*, 96 S.W.3d at 266 (quoting *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002)). Considering the entire record, if the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient. *Id.* We defer to the factfinder's findings and do not substitute our judgment for the factfinder's. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). The factfinder is the sole arbiter of the witnesses' credibility and demeanor. *See id.* at 109 (quoting *In re J.L.*, 163 S.W.3d 79, 86–87 (Tex. 2005)).

## ANALYSIS

### Statutory Ground Q

In his second issue, Father challenges the legal and factual sufficiency of the evidence to support predicate ground Q. Coupled with a best interest finding, a trial court may order termination of a parent's rights to a child if it finds by clear and convincing evidence that a parent has "knowingly engaged in criminal conduct that has resulted in the parent's: (i) conviction of an offense; and (ii) confinement or imprisonment and inability to care for the child for not less than two years from the

25

date of filing the petition[.]" Tex. Fam. Code Ann. § 161.001(b)(1)(Q). "Terminating parental rights under subsection Q requires that the parent be both incarcerated or confined *and* unable to care for the child for at least two years from the date the termination petition is filed." *In re H.R.M.*, 209 S.W.3d at 110 (emphasis original); *see In re H.O.*, 555 S.W.3d 245, 251 (Tex. App.—Houston [1st Dist.] 2018, pet. denied). In *In re Caballero*, the Amarillo Court of Appeals interpreted Q as requiring a three-step process: (1) the party seeking termination must establish the parent's knowing criminal conduct resulted in incarceration for more than two years; (2) the parent must produce some evidence as to how he would arrange to provide care for the child during that period; and (3) the party seeking termination would then have the burden of persuasion that the arrangement would not satisfy the parent's duty. *See* 53 S.W.3d 391, 396 (Tex. App.—Amarillo 2001, pet. denied); *see also In re B.D.A.*, 546 S.W.3d 346, 358 (Tex. App.—Houston [1st Dist.] 2018, pet. denied).

Father does not dispute that his knowing criminal conduct resulted in his conviction and incarceration for more than two years from the date of filing the petition, rather he disputes the "inability to care for a child" element. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(Q); *In re H.R.M.*, 209 S.W.3d at 110. Given that the two-year incarceration period is undisputed, we address whether Father produced some evidence as to how he would arrange care to provide for I.N.B. during his

incarceration. *See In re B.D.A.*, 546 S.W.3d at 358 (noting shifting burden and three-step process); *In re Caballero*, 53 S.W.3d at 396 (same).

"[A] parent relying on another's provision of care to avoid termination under Subsection (Q) must demonstrate that the care is being provided on behalf of the parent, not out of an existing duty or inclination to care for the child." *In re J.G.S.*, 574 S.W.3d 101, 119 (Tex. App.—Houston [1st Dist.] 2019, pet. denied) (citing *In re H.R.M.*, 209 S.W.3d at 105) (other citations omitted). An incarcerated parent does not meet his burden by merely producing evidence of an un-incarcerated relative who is willing and able to care for the child, rather the parent must present evidence the alternative caregiver is providing care on behalf of the parent. *See id.* (citations omitted). Likewise, absent evidence that an un-incarcerated parent has agreed to provide support for the child on the incarcerated parent's behalf, merely leaving a child with an un-incarcerated parent does not constitute the ability to provide care. *See In re S.A.B.*, No. 05-20-00272-CV, 2020 WL 4915329, at *5 (Tex. App.—Dallas Aug. 21, 2020, no pet.) (mem. op.). While there was some evidence that T.D., K.D. and D.D. would care for I.N.B., Father must establish that they are doing so *on behalf of* Father, not out of their own personal obligations to or desires for the child. *In re J.G.S.*, 574 at 121; *see also In re H.R.M.*, 209 S.W.3d at 110; *In re D.D.*, No. 07-19-00392-CV, 2020 WL 830988, at *2 (Tex. App.—Amarillo Feb. 19, 2020, pet. denied) (mem. op.).

Father asserts that "the alternative proposed caregivers indicated they would do so on behalf of [Father]." But the record does not support his assertion. *See In re H.R.M.*, 209 S.W.3d at 110 (noting that nobody testified they were willing to care for the child on father's behalf during his incarceration). T.D. testified that I.N.B. is his son, he took him in as such, has had him since birth, and he does not want him taken away. Although he would be willing to co-parent with Father, this testimony does not show that T.D. is caring for I.N.B. on Father's behalf. Rather, it shows T.D. treated I.N.B. as his own child. Likewise, K.D. testified that when communicating with Father, he expressed a desire for I.N.B. to return to Mother, and alternatively to live with K.D. and D.D. or T.D. Moreover, K.D. testified that although she might be willing to co-parent with Father if he "does right," she did not feel it was in I.N.B.'s best interest for Father to remain in I.N.B.'s life given his incarceration and that he had never been a part of I.N.B.'s life. D.D. said he wanted I.N.B. to be returned to Mother with T.D. having permanent managing conservatorship, but if not, he and K.D. would adopt I.N.B. D.D. also believed Father had the potential to be a positive person in I.N.B.'s life. However, none of this testimony establishes that K.D. and D.D. agreed to care for I.N.B. on Father's behalf. *See In re H.R.M.*, 209 S.W.3d at 110; *In re J.G.S.*, 574 S.W.3d at 118; *In re D.D.*, 2020 WL 830988, at *2.

Further, even if Father met his burden of production, the trial court could have concluded based on the evidence that these placements were inappropriate for I.N.B.

28

*See In re Caballero*, 53 S.W.3d at 396 (noting once parent meets burden of production showing he has arranged to provide care during incarceration, the Department has the burden of persuasion to show the arrangement is not appropriate). Witnesses testified that T.D. knew I.N.B. was exhibiting concerning behaviors in his home but did not take steps to get him the help he needed. Additionally, testimony established that although K.D. did not currently smoke marijuana, she had done so daily for years after suffering a heart attack, that D.D. worked offshore for weeks at a time, and they recently filed for bankruptcy. I.N.B. was removed from Mother twice after the child and Mother tested positive for methamphetamines. Finally, evidence established that I.N.B. had significant emotional needs and behavioral issues that required ongoing therapy several times a week, which the trial court could have determined these proposed alternate caregivers would have been unable to meet.

Viewing the evidence in the light most favorable to the trial court's finding under subsection 161.001(b)(1)(Q), we conclude that the trial court could reasonably form a firm belief or conviction that Father knowingly engaged in criminal activity that resulted in his conviction of an offense, and confinement or imprisonment and inability to care for I.N.B. for not less than two years from the date of filing the petition. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(Q); *In re H.R.M.*, 209 S.W.3d at 110. Therefore, the evidence was legally sufficient to support the trial court's

29

predicate finding as to subsection Q. Also, considering the entire record and any disputed evidence that the trial court could not credit in favor of its finding and giving due consideration to evidence that the trial court could reasonably have found to be clear and convincing, we determine the trial court could reasonably form a firm belief or conviction about the truth of the Department's allegations. *See In re J.F.C.*, 96 S.W.3d at 266; *In re C.H.*, 89 S.W.3d 17, 25. Accordingly, the evidence is factually sufficient to support the trial court's predicate finding as to subsection Q. We overrule this issue.

Best Interest

Father challenges the legal and factual sufficiency of the evidence supporting the trial court's best interest finding. Trial courts have wide latitude in determining the children's best interest. *See Gillespie v. Gillespie*, 644 S.W.2d 449, 451 (Tex. 1982). There is a strong presumption that the children's best interest is served by keeping them with their parent. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (citation omitted); *In re D.R.A.*, 374 S.W.3d 528, 533 (Tex. App.—Houston [14th Dist.] 2012, no pet.); *see also* Tex. Fam. Code Ann. § 153.131(b). Prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest.  Tex. Fam. Code Ann. § 263.307(a).

The Family Code outlines factors to be considered in determining whether a parent is willing and able to provide a safe environment for the children. *See id.* §

30

263.307(b). Several other nonexclusive factors may be considered in a best interest analysis, including: (1) the desires of the children; (2) the emotional and physical needs of the children now and in the future; (3) the emotional and physical danger to the children now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals to promote the best interest of the children; (6) the plans for the children by these individuals or by the agency seeking custody; (7) the stability of the home or proposed placement; (8) the parent's acts or omissions that may indicate that the existing parent-child relationship is not a proper one; and (9) any excuse for the parent's acts or omissions. *See Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *see also In re A.C.*, 560 S.W.3d 624, 631 (Tex. 2018) (characterizing the *Holley* factors as "nonexclusive"). No particular *Holley* factor is controlling, and evidence of one factor may be enough to support a finding that termination is in the child's best interest. *See M.C. v. Tex. Dep't of Family & Protective Servs.*, 300 S.W.3d 305, 311 (Tex. App.—El Paso 2009, pet. denied) ("Undisputed evidence of just one factor may be sufficient to support a finding that termination is in the best interest of a child.") (citations omitted); *see also In re C.H.*, 89 S.W.3d at 27.

We may consider circumstantial evidence, subjective factors, and the totality of the evidence in our best interest analysis. *See In re N.R.T.*, 338 S.W.3d 667, 677 (Tex. App.—Amarillo 2011, no pet.). A parent's past conduct is relevant to

determining the parent's present and future ability to care for a child. *See In re C.H.*, 89 S.W.3d at 28. Evidence supporting the statutory grounds for termination may also be used to support a finding that the best interest of the child warrants termination of the parent-child relationship. *See id.*

We have explained the evidence shows Father's long history of drug use, criminal behavior, repeated incarcerations, refusal to take any part in I.N.B.'s life prior to this case, and only minimal involvement after I.N.B.'s removal. Multiple witnesses, including Grandmother, testified it was in I.N.B.'s best interest for Father's rights to be terminated. Specifically, Grandmother expressed concerns about Father's pattern of drug abuse, criminal behavior, and lack of involvement with I.N.B. continuing and saw nothing that made her believe circumstances had changed. Grandmother testified that Father had a pattern of going to jail, promising to get clean, then returning to the same friends and behaviors within weeks of release. Father admittedly had not provided any financial or other support to I.N.B. Mother testified Father was not a part of I.N.B.'s life and had only seen him a few times. Grandmother testified it was in I.N.B.'s best interest that Father's rights be terminated, and K.D. testified that she does not think it is in I.N.B.'s best interest for Father to remain in his life as Father has never been a part of it.

While evidence of placement plans and adoption are relevant to best interest, the lack of evidence about definitive plans for permanent placement and adoption

32

cannot be the dispositive factor. *Id.* Otherwise, best interest determinations would regularly be subject to reversal on the sole basis that an adoptive family cannot yet be located. *Id.* Instead, we ask whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that termination of the parent's rights is in the child's best interest—even if the agency is unable to identify with precision the child's future home environment. *See id.* Although permanent placements were not final for I.N.B., the E.D. testified they would like to adopt I.N.B. and could give him a safe, stable, and loving environment. E.D. testified that I.N.B. had significant needs that required consistent one-on-one interaction and was undergoing multiple types of therapy several times a week. She further testified that I.N.B. had "progressed tremendously" and explained how the therapies had helped him while in their care. E.D. testified that I.N.B. is bonded to them. The caseworker testified that E.D. and her husband are getting I.N.B. the therapies he needs and that E.D. does very well with him. The guardian ad litem also noted on the record at trial that I.N.B. wishes to remain with E.D. and her husband. When asked what his plans were with I.N.B., Father said he would become a productive member of society and be there for him. Father testified that he had read I.N.B.'s psychological evaluation and understood he had problems but did not necessarily agree with the diagnoses, although he admitted his son exhibited concerning behaviors.

Considering the evidence related to best interest, deferring to the trial court's determinations on witness credibility, the resolution of conflicts in the evidence, and the weight given to the testimony, we conclude that the statutory and *Holley* factors weigh in favor of the trial court's finding that termination of Father's parental rights is in I.N.B.'s best interest. *See* Tex. Fam. Code Ann. §§ 161.001(b)(2), 263.307(a), (b); *Holley*, 544 S.W.2d at 371–72. The trial court could have reasonably formed a firm belief or conviction that termination of Father's parental rights was in I.N.B.'s best interest. *See In re C.H.*, 89 S.W.3d at 28. We overrule this issue.

Department Records

Finally, Father generally complains about the Department's production of records in conjunction with his sufficiency challenge to the best interest finding. He argues the Department's production of documents did not comport with a pretrial order to supplement records by a certain date each month, and when it did, the Department failed to include certain documents in its records. He asserts this violated his due process rights and hampered his ability to meet the requirements to avoid termination.

Courts recognize the fundamental liberty interest a parent has under the Due Process Clause of the United States Constitution in his or her child and require the State to provide the parent with fundamentally fair procedures, including a clear and convincing evidentiary standard, when seeking to terminate parental rights. *See In*

34

*re E.N.C.*, 384 S.W.3d at 802; *see also Santosky v. Kramer,* 455 U.S. 745, 753–54 (1982). Based on the record before us, we conclude that the trial court's handling of the Department's production of records and missing documents does not rise to the level of a due process violation. Father was represented by counsel throughout the proceedings. The record shows he was afforded an opportunity within days of I.N.B.'s removal to provide input regarding potential caregivers but initially did not want to be involved and refused to sign a resource form. He was also consulted about potential placements throughout the proceedings. The trial court held an evidentiary hearing regarding Father's concerns and addressed those concerns by limiting what documents the Department could use at trial.

Additionally, the record shows that certain complained-of records, including text messages and home studies, were introduced by Father's attorney and admitted into evidence at trial. Rather than support Father's position, and consistent with witnesses' trial testimony, these documents call into question the appropriateness of Father's recommended caregivers, as well as his credibility. Father has not shown harm, specifically how any of these documents prevented him from making alternate arrangements for his child. We will not reverse a judgment on appeal unless the complained-of error probably caused the rendition of an improper judgment. *See* Tex. R. App. P. 44.1. Even after liberally construing Father's brief, considering the whole record, and our analysis of the evidence relating to his legal and factual

sufficiency challenges, we conclude that Father failed to demonstrate that the complained-of-errors caused the rendition of an improper judgment in this case. *See id.*; *see also Lion Copolymer Holdings, LLC v. Lion Polymers, LLC*, 614 S.W.3d 729, 732 (Tex. 2020) (noting that we construe briefs reasonably but liberally).

We overrule Father's complaints about the trial court's discovery rulings and the trial court's rulings admitting several records the Department produced after the deadline established in the trial court's docket-control order.

CONCLUSION

Having overruled Father's issues, we affirm the trial court's termination order.

AFFIRMED.

_____
W. SCOTT GOLEMON
Chief Justice

Submitted on January 24, 2023
Opinion Delivered February 2, 2023

Before Golemon, C.J., Horton and Johnson, JJ.